IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:11-CV-707-D

| | | |
|---|---|---|
| J.W., by and through his parent and guardian, and BRENDA NEWSOME, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | **ORDER** |
| | ) | |
| THE JOHNSTON COUNTY BOARD OF EDUCATION, ED CROOM, in his individual and official capacities, and JENNIFER MOORE, in her individual and official capacities, | ) | |
| | ) | |
| Defendants. | ) | |

Former special education teacher Brenda Newsome and her former student, J.W., ("plaintiffs") have sued the Johnston County Board of Education, Board Superintendent Ed Croom, and principal Jennifer Moore ("defendants"). Plaintiffs' amended complaint contains a variety of federal and state claims concerning Newsome's employment and J.W.'s educational environment. Defendants moved to dismiss portions of the amended complaint under Rule 12(b)(1), 12(b)(2), and 12(b)(6) of the Federal Rules of Civil Procedure. As explained below, the court grants in part and denies in part the motion to dismiss.

I.

At all relevant times, J.W. was a minor child with Down Syndrome who attended Selma Middle School ("the School") in Johnston County, North Carolina. Am. Compl. [D.E. 17] ¶ 1. The Johnston County Board of Education (the "Board") operates the School. Id. ¶ 3. Jennifer Moore ("Moore") was the Principal of the School. Id. ¶ 4. Ed Croom ("Croom") was the Superintendent for the Board. Id. ¶ 5.

Brenda Newsome ("Newsome") worked full-time at the School as a special education teacher from August 2004 until June 15, 2009. Id. ¶¶ 2, 10. While employed at the School, Newsome exceeded professional standards and, until the incidents alleged in this action, received positive employment evaluations. See id. ¶¶ 11–12. In her last year at the School, Newsome was J.W.'s teacher. See id. ¶¶ 2, 10, 15.

Before the start of the 2008–2009 school year, the Board consolidated the School's two special education classes into a single class. Id. ¶ 13. As a result, the teacher-to-student ratio for the single special education class allegedly fell below applicable state and federal guidelines. See id. ¶¶ 14, 17–18. Newsome was concerned that the new ratio would impede the learning of students with intensive needs, and she shared her concerns with the parents of the students in her special education class. See id. ¶ 19. Newsome criticized the ratio and also encouraged parents to lobby the Board and other relevant public officials to improve the ratio. See id. ¶¶ 20–21. Croom and Moore instructed Newsome to stop criticizing the ratio and reprimanded Newsome for her advocacy work. Id. ¶ 22; see Pls.' Mem. Opp'n Mot. Dismiss [D.E. 22] 3.

During the 2008–2009 school year, Newsome taught her special education class of ten students with the help of a single teaching assistant. Am. Compl. ¶ 26. The teaching assistant was incompetent, and Board evaluators concluded that the teaching assistant failed to meet the requirements necessary for working with students with intensive needs. See id. ¶¶ 27–28. Despite being aware of the teaching assistant's incompetence, the Board, Croom, and Moore did not retrain, remove, or discipline the teaching assistant. Id. ¶¶ 29–30. Newsome also informed Croom and Moore that her classroom lacked the educational resources required for students with intensive needs. See id. ¶ 31. The Board, Croom, and Moore did not provide the requested resources. See id. ¶¶ 32–34. Rather, Croom and Moore asked Newsome to stop reporting the violations to them,

2

to relevant public officials, and to the parents of the students. Id. ¶ 34.

Newsome continued to communicate with the parents, however, and Moore and Croom formally disciplined her. Id. ¶ 35. Knowing that Newsome would become eligible for tenure at the end of the 2008–2009 school year, see id. ¶ 23, Moore and Croom also led Newsome to believe that she would be denied tenure and possibly lose her job unless she ceased advocating on behalf of her students. See id. ¶¶ 35, 37. As a result, Newsome ceased her advocacy. Id. ¶ 36.

During the 2008–2009 school year, Moore authorized a non-disabled student to assist with Newsome's special education class (the "student aide"). Id. ¶¶ 41–42. On or about April 2, 2009, J.W. left his classroom to use the restroom. Id. ¶ 42. A teacher noticed J.W.'s absence from his classroom and went looking for him. Id. ¶ 43. Upon entering the restroom, the teacher heard shuffling from one of the stalls and discovered the student aide alone with J.W. in the stall. Id. ¶ 43. J.W. appeared disheveled and frightened, and his shirt was untucked. Id. ¶ 44. On April 6, 2009, J.W. disclosed that the student aide had sexually assaulted him in the restroom. Id. ¶ 45.

Newsome and J.W.'s mother reported J.W.'s accusations of sexual assault to Moore and Croom, both orally and in writing. Id. ¶ 46. Newsome and J.W.'s mother also presented Moore and Croom with a professional, written opinion that forensic evidence corroborated J.W.'s sexual-abuse accusation. Id. ¶ 47. Moore assured Newsome and J.W.'s mother that she would report the incident and investigate the accusations against the student aide. Id. ¶ 48. Newsome repeatedly asked Moore and Croom for an update on the report and investigation. Id. ¶ 49. Moore and Croom misled Newsome into believing that they had filed a report and initiated an investigation. Id. ¶ 50. Moore instructed Newsome and J.W.'s mother to not report the incident. Id. ¶ 51. Moore and Croom did not report the incident or investigate the accusations. Id. ¶¶ 50, 53, 56.

3

Despite knowing about the incident, Moore and Croom continued to permit the student aide to work with intensive-needs students. Id. ¶¶ 54–55, 57. Newsome reported to Moore and Croom that teachers continued to find the student aide alone with intensive-needs students in the hallway and restrooms. See id. ¶ 60. Moreover, the student aide's return to the special education classroom caused J.W. emotional and psychological trauma that forced J.W. to miss several days of school and seek professional treatment. Id. ¶¶ 58–59.[1] In addition, Newsome informed Moore and Croom that another intensive-needs student accused the student aide of sexual assault and was suffering emotional and psychological trauma. Id. ¶¶ 61–62. Moore and Croom still did not intervene. Id. ¶¶ 60–61, 63. Rather, Moore and Croom gave the student aide an award for the student's volunteer work with the intensive-needs students. Id. ¶ 64.

Newsome continued to report the accusations made by the intensive-needs students. Id. ¶ 65. Moore threatened to fire Newsome if she continued to report the accusations and to inquire about an investigation into J.W.'s accusations. Id. Newsome did not relent. Id. ¶ 66. As a result of Newsome's persistence and her earlier advocacy about the teacher-student ratio, Moore informed Newsome that Moore would recommend to the Board that it not renew Newsome's contract. Id. ¶ 67. The Board routinely adopted Moore's employment recommendations. Id. ¶¶ 68–69. Moore then threatened Newsome that if she did not resign voluntarily, she would never again teach intensive-needs students in North Carolina public schools. Id. ¶ 70.

Because of Moore's threats, Newsome initially did not ask the Board to renew her contract. Id. ¶ 71. Newsome changed her mind, however, and rescinded her resignation letter and notified Croom that she wanted to renew her contract and seek tenure. Id. ¶ 72. Croom refused to submit

---

[1] After the 2008–2009 school year, J.W. enrolled in a school outside of Johnston County. Id. ¶ 59.

Newsome's contract to the Board for renewal. Id. ¶ 73. The Board, aware of Croom's decision and the reasons for it, approved Croom's decision to not renew Newsome's contract. Id. ¶ 74.

## II.

On December 7, 2011, J.W., by and through his parent and guardian, and Newsome initiated this action against Croom and Moore, both in their individual and official capacities, and the Board. See Compl. [D.E. 1]. On February 6, 2012, defendants answered the complaint [D.E. 16] and moved to dismiss portions of the complaint [D.E. 14–15]. On March 1, 2012, plaintiffs filed an amended complaint. See Am. Compl.

In the amended complaint, plaintiffs assert the following claims:

(1) Moore and Croom, acting in their individual capacities, and the Board conspired to create a hostile educational environment for and discriminate against J.W. based on his gender and disability, in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 et seq., Section 504 of the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. § 794, Title IX of the Education Amendment of 1972 ("Title IX"), 20 U.S.C. §§ 1681–1688, and the Fourteenth Amendment of the United States Constitution. See id. ¶¶ 78–91.

(2) Moore and Croom, acting in their individual capacities, and the Board conspired to conceal evidence of J.W.'s sexual abuse because of his gender and disability, when they would not have done the same for a non-disabled child, in violation of the Equal Protection Clause of the Fourteenth Amendment and Section 19 of Article I of the North Carolina Constitution. See id. ¶¶ 92–98.

(3) Moore and Croom, acting in their individual capacities, and the Board retaliated against Newsome for attempting to enforce the rights of the intensive-needs students, in violation of the ADA, Section 504, Title IX, the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400–1482, and the Fourteenth Amendment. See id. ¶¶ 99–108; see also id. ¶ 91.

(4) Moore and Croom, acting in their individual capacities, and the Board retaliated against Newsome for voicing her concerns about the School's treatment of the intensive-needs students, in violation of the First Amendment. See id. ¶¶ 109–17.

(5) Moore and Croom, acting in their individual capacities, and the Board are liable as supervisors for being "deliberately indifferent to the constitutional rights of . . . disabled children at [the School]" by failing to prevent the student aide from sexually

5

assaulting intensive-needs students. See id. ¶¶ 118–25.

(6) Moore and Croom, acting in their individual capacities, and the Board, based on the conduct of its employees while acting within the scope of their employment, attempted to obstruct public justice in connection with the student aide's sexual assaults of intensive-needs students. See id. ¶¶ 126–30.

(7) Moore and Croom, acting in their individual capacities, and the Board, based on the conduct of its employees while acting within the scope of their employment, intended to cause, or were recklessly indifferent to causing, plaintiffs severe emotional distress. See id. ¶¶ 131–37.

(8) Moore and Croom, acting in their individual capacities, and the Board, based on the conduct of its employees while acting within the scope of their employment, breached a fiduciary duty to Newsome and J.W. See id. ¶¶ 138–46.

(9) The Board wrongfully discharged Newsome. See id. ¶¶ 147–53.

(10) Moore and Croom, acting in their individual capacities, and the Board were negligent in under-staffing the special education classroom, permitting a student aide to abuse the intensive-needs students, and not reporting the sexual abuse. See id. ¶¶ 154–59.

(11) Moore and Croom, acting in their individual capacities, and the Board, based on the conduct of its employees while acting within the scope of their employment, negligently caused plaintiffs severe emotional distress. See id. ¶¶ 160–63.

(12) The Board failed to adequately supervise subordinates. See id. ¶¶ 164–67.

(13) The Board, based on the conduct of its employees while acting within the scope of their employment, failed to protect J.W. from sexual assault and retaliated against Newsome for the enforcement of J.W.'s federal rights, in violation of rights guaranteed by the North Carolina Constitution. See id. ¶¶ 168–73.

In total, plaintiffs assert five federal claims and seven state-law claims.

On March 15, 2012, defendants answered the amended complaint [D.E. 20] and moved to dismiss portions of the amended complaint under Rule 12(b)(1), Rule 12(b)(2), and Rule 12(b)(6) of the Federal Rules of Civil Procedure [D.E. 18–19]. On April 10, 2012, plaintiffs moved to appoint a guardian ad litem for J.W. [D.E. 21]. On April 11, 2012, plaintiffs responded in opposition to defendants' motion to dismiss [D.E. 22]. On April 26, 2012, defendants replied [D.E.

6

23]. On June 18, 2012, the court granted plaintiffs' motion to appoint a guardian ad litem [D.E. 24].

III.

Defendants seek dismissal of several of plaintiffs' claims based on Rule 12(b)(6) of the Federal Rules of Civil Procedure for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6); see Defs.' Mot. Dismiss 1. In analyzing a motion to dismiss under Rule 12(b)(6), a court must determine whether the complaint is legally and factually sufficient. See Ashcroft v. Iqbal, 556 U.S. 662, 678–79 (2009); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555–56 (2007); Coleman v. Md. Ct. of Appeals, 626 F.3d 187, 190 (4th Cir. 2010), aff'd, 132 S. Ct. 1327 (2012); Giarratano v. Johnson, 521 F.3d 298, 302 (4th Cir. 2008); Goodman v. Praxair, Inc., 494 F.3d 458, 464 (4th Cir. 2007) (en banc). A court need not accept a complaint's "legal conclusions, elements of a cause of action, and bare assertions devoid of further factual enhancement." Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 255 (4th Cir. 2009); see Iqbal, 556 U.S. at 678–79. Similarly, a court "need not accept as true unwarranted inferences, unreasonable conclusions, or arguments." Giarratano, 521 F.3d at 302 (quotation omitted); see Iqbal, 556 U.S. at 678–79.

Defendants also seek dismissal of all of plaintiffs' state-law claims based on governmental immunity. See Defs.' Mot. Dismiss 2. Although the governmental immunity defense presents a question of jurisdiction, North Carolina courts have yet to resolve whether governmental immunity challenges personal jurisdiction or subject-matter jurisdiction. See Frye v. Brunswick Cnty. Bd. of Educ., 612 F. Supp. 2d 694, 700–01 (E.D.N.C. 2009) (cataloging cases); M Series Rebuild, LLC v. Town of Mount Pleasant, 730 S.E.2d 254, 257 & n.1 (N.C. Ct. App. 2012) ("[W]hether sovereign immunity is grounded in a lack of subject matter jurisdiction or personal jurisdiction is unsettled in North Carolina."). Because defendants seek dismissal under both Rule 12(b)(1) and Rule 12(b)(2),

7

the court analyzes the motion under both governing standards. See Frye, 612 F. Supp. 2d at 701.

Under Rule 12(b)(1), the plaintiff has the burden of proving subject-matter jurisdiction. Richmond, Fredericksburg & Potomac R.R. v. United States, 945 F.2d 765, 768 (4th Cir. 1991). A court may "regard the pleadings as mere evidence on the issue, and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." Evans v. B.F. Perkins Co., 166 F.3d 642, 647 (4th Cir. 1999) (quotation omitted). A district court should grant a Rule 12(b)(1) motion to dismiss "only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." Id. (quotation omitted). The pleadings are construed in the light most favorable to the nonmoving party. See, e.g., Adams v. Bain, 697 F.2d 1213, 1219 (4th Cir. 1982).

Under Rule 12(b)(2), the plaintiff must prove by a preponderance of the evidence that the court can exercise personal jurisdiction. See Combs v. Bakker, 886 F.2d 673, 676 (4th Cir. 1989). But when the court rules on a Rule 12(b)(2) motion without an evidentiary hearing, the plaintiff need only establish a prima facie case. Id. When determining whether the plaintiff has met this burden, courts resolve all factual disputes and draw all reasonable inferences in the light most favorable to the plaintiff. Id.; see Mylan Labs., Inc. v. Akzo, N.V., 2 F.3d 56, 60 (4th Cir. 1993).

A.

Defendants seek to dismiss the claims made on behalf of J.W. because "his parent and guardian" has not been appointed to represent J.W. in this action. See Defs.' Mem. Supp. Mot. Dismiss 7–8. State law determines an individual's capacity to sue. See Fed. R. Civ. P. 17(b). J.W. is a minor, see Am. Compl. ¶ 1, and minors lack the capacity to sue in North Carolina. See N.C. R. Civ. P. 17(b). Although a parent may initiate an action in North Carolina on behalf of a minor, the

8

parent can do so only with court approval. See, e.g., Genesco, Inc. v. Cone Mills Corp., 604 F.2d 281, 285–86 (4th Cir. 1979).

On June 18, 2012, the court appointed Jenny Wiggins as J.W.'s guardian ad litem [D.E. 24]. Having been duly appointed, Jenny Wiggins may proceed with J.W.'s claims against defendants on J.W.'s behalf. Thus, the motion to dismiss the claims made on behalf of J.W. is denied.

## B.

In claims one and three, J.W. and Newsome allege violations of the ADA, Section 504, Title IX, the IDEA,[2] and the Fourteenth Amendment. See Am. Compl. ¶¶ 78–91, 99–108. Defendants seek dismissal of several parts of claims one and three. See Defs.' Mem. Supp. Mot. Dismiss 8–11.

First, defendants argue that Moore and Croom cannot be liable under the ADA, Section 504, Title IX, and the IDEA because these statutes do not create individual liability. See Defs.' Mem. Supp. Mot. Dismiss 8–9. Defendants are correct. See, e.g., Baird ex rel. Baird v. Rose, 192 F.3d 462, 472 (4th Cir. 1999) ("[T]he ADA does not permit an action against individual defendants for retaliation . . . ."); Lucas v. Henrico Cnty. Sch. Bd., 822 F. Supp. 2d 589, 613 (E.D. Va. 2011) (ADA and Section 504); B.I. v. Montgomery Cnty. Bd. of Educ., 750 F. Supp. 2d 1280, 1283 (M.D. Ala. 2010) (IDEA); D.A. v. Hous. Indep. Sch. Dist., 716 F. Supp. 2d 603, 611 (S.D. Tex. 2009) (IDEA, ADA, and Section 504); Bracey v. Buchanan, 55 F. Supp. 2d 416, 419 (E.D. Va. 1999) (Title IX).

---

[2] Newsome seeks relief under the IDEA, see Am. Compl. ¶ 102, but J.W. does not. See id. ¶¶ 78–91. Although the amended complaint alleges that the teacher-student ratio in the special education classroom violated the IDEA, see id. ¶¶ 17, 39, J.W. does not seek relief under the IDEA. Even if the court were to construe the amended complaint to include such a claim, the IDEA claim fails because J.W. failed to allege that he has exhausted available administrative remedies. See 20 U.S.C. § 1415(l); MM ex rel. DM v. Sch. Dist. of Greenville Cnty., 303 F.3d 523, 536 (4th Cir. 2002); McGraw v. Bd. of Educ. of Montgomery Cnty., 952 F. Supp. 248, 254–55 (D. Md. 1997); cf. Scruggs v. Campbell, 630 F.2d 237, 239 (4th Cir. 1980).

Accordingly, the court dismisses claims one and three to the extent the claims purport to seek relief from Moore and Croom in their individual capacities.

Second, defendants argue that the applicable statute of limitations bars plaintiffs' claims under the ADA and Section 504. See Defs.' Mem. Supp. Mot. Dismiss 9–11. Because Congress has not adopted a specific statute of limitations for actions under the ADA and Section 504, the analogous state statute of limitations applies. See A Soc'y Without a Name v. Virginia, 655 F.3d 342, 347–48 (4th Cir. 2011), cert. denied, 132 S. Ct. 1960 (2012); McCullough v. Branch Banking & Trust Co., 35 F.3d 127, 129 (4th Cir. 1994); Wolsky v. Med. Coll. of Hampton Rds., 1 F.3d 222, 223 (4th Cir. 1993). North Carolina's most analogous statute to the ADA and Section 504 is the Persons with Disabilities Protection Act ("PDPA"), N.C. Gen. Stat. ch. 168A. See McCullough, 35 F.3d at 130, 132; Green v. Café, No. 4:04-CV-111-H(2), 2008 WL 7871053, at *5 (E.D.N.C. Nov. 5, 2008) (unpublished); Stroud v. Harrison, 131 N.C. App. 480, 486, 508 S.E.2d 527, 530 (1998). The PDPA provides a two-year statute of limitations for non-employment-related claims. See N.C. Gen. Stat. § 168A-12. Accordingly, "[c]laims brought pursuant to Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act are both subject to the two-year statute of limitations set forth in North Carolina's Persons with Disabilities Protection Act." Green, 2008 WL 7871053, at *5.

Although the limitations periods for claims brought under the ADA and Section 504 are borrowed from state law, the time for accrual of an action is a matter of federal law. See A Soc'y Without a Name, 655 F.3d at 348; Cox v. Stanton, 529 F.2d 47, 50 (4th Cir. 1975). A claim accrues when the plaintiff knows or has reason to know of the injury forming the basis of an action. See A Soc'y Without a Name, 655 F.3d at 348; Cox, 529 F.2d at 50.

Plaintiffs contend that the court cannot address the statute of limitations issue before discovery. See Pls.' Mem. Opp'n Mot. Dismiss 13. "Where facts sufficient to rule on an affirmative defense—including the defense that the plaintiff's claim is time-barred—are alleged in the complaint, the defense may be reached by a motion to dismiss filed under Rule 12(b)(6)." Pressley v. Tupperware Long Term Disability Plan, 553 F.3d 334, 336 (4th Cir. 2009) (quotations and alteration omitted); see Goodman, 494 F.3d at 464. Here, the factual allegations in the amended complaint establish that the incidents, and the accompanying injuries, occurred during the 2008–2009 school year. Moreover, the amended complaint makes clear that plaintiffs were aware of the incidents and injuries at the time they occurred. Given that the 2008–2009 school year ended in June 2009, see Am. Compl. ¶ 68, plaintiffs' claims under the ADA and Section 504 accrued not later than June 2009. Plaintiffs filed their original complaint on December 7, 2011, five months after the two-year statute of limitations had expired.

Nonetheless, plaintiffs argue that the statute of limitations does not bar J.W.'s claims because J.W. is a minor. See Pls.' Mem. Opp'n Mot. Dismiss 12–13. "When a state statute [of limitations] is borrowed, as here, the federal court will also borrow the state rules on tolling." Shook ex rel. Shook v. Gaston Cnty. Bd. of Educ., 882 F.2d 119, 121 (4th Cir. 1989); see Bd. of Regents v. Tomanio, 446 U.S. 478, 483 (1980).[3] North Carolina has a special tolling provision that preserves actions until an individual is no longer a minor. See N.C. Gen. Stat. § 1-17(a); Genesco, 604 F.2d at 284. "The North Carolina courts, however, have developed an exception to this statute when the

---

[3] In Shook, the Fourth Circuit recognized that federal courts have declined to borrow state tolling provisions when the provisions were "contrary to a federal policy that representatives of educationally handicapped children promptly assert the child's educational rights." 882 F.2d at 121 n.2; see Bishop v. Children's Ctr. for Dev. Enrichment, 618 F.3d 533, 537–38 (6th Cir. 2010). The Shook court concluded, however, that North Carolina's tolling provision was not contrary to federal policy because "the exercise of a state tolling provision in favor of the child should not deter the parents from bringing a suit at an earlier time." 882 F.2d at 121 n.2.

infant is represented by a guardian." Genesco, 604 F.2d at 284; see Rowland v. Beauchamp, 253 N.C. 231, 234–35, 116 S.E.2d 720, 722–23 (1960); Johnson v. Pilot Life Ins. Co., 7 S.E.2d 475, 477–78 (N.C. 1940). Thus, "the North Carolina statute of limitations runs against an infant when he has a legal guardian who is charged with the duty of bringing suit on his behalf." Genesco, 604 F.2d at 286. Accordingly, the applicable statute of limitations for J.W.'s claims began to run on June 18, 2012, the day the court appointed Jenny Wiggins to serve as his guardian ad litem. Thus, J.W.'s claims under the ADA and Section 504 are not time barred. See Genesco, 604 F.2d at 286. On the other hand, Newsome's claims under the ADA and Section 504 are time barred.

In sum, the court dismisses claims one and three to the extent the claims seek to hold Moore and Croom liable in their individual capacities, and to the extent Newsome seeks relief under the ADA and Section 504. J.W. can proceed with his claims under the ADA, Section 504, Title IX, and the Fourteenth Amendment against the Board.[4] Newsome can proceed with her claims under Title IX, the IDEA,[5] and the Fourteenth Amendment against the Board.

C.

In claim two, J.W. alleges that Moore and Croom, acting in their individual capacities, and the Board conspired to conceal evidence of J.W.'s sexual abuse because of his gender and disability,

---

[4] To the extent plaintiffs allege claims against Moore and Croom in their official capacities, such claims duplicate plaintiffs' claims against the Board. See, e.g., Mullis v. Sechrest, 347 N.C. 548, 554–55, 495 S.E.2d 721, 725 (1998); Meyer v. Walls, 347 N.C. 97, 110, 489 S.E.2d 880, 887 (1997). "[A] suit against a defendant in his official capacity means that the plaintiff seeks recovery from the entity of which the public servant defendant is an agent." Meyer, 347 N.C. at 110, 489 S.E.2d at 887. Plaintiffs consent to dismissing their claims against Moore and Croom in their official capacities. See Pls. Mem. Opp'n Mot. Dismiss 17 n.2. Thus, the court dismisses plaintiffs' claims against Moore and Croom in their official capacities.

[5] In their reply brief, defendants contend that the IDEA does not create a cause of action for Newsome's retaliation claim. See Defs.' Reply Br. 2. Because defendants raised this argument for the first time in their reply, the court declines to consider it at this time. See N.C. Alliance for Transp. Reform v. U.S. Dep't of Transp., 713 F. Supp. 2d 491, 526–27 (M.D.N.C. 2010).

12

and thereby denied him equal protection under the law as guaranteed by the Equal Protection Clause of the Fourteenth Amendment and Article I, Section 19 of the North Carolina Constitution. See Am. Compl. ¶¶ 92–98. To state an equal protection claim, a plaintiff must allege "that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination." Morrison v. Garraghty, 239 F.3d 648, 654 (4th Cir. 2001); see Williams v. Hansen, 326 F.3d 569, 576 (4th Cir. 2003). "[T]he Equal Protection Clause of Article I, [Section] 19 of the Constitution of North Carolina is functionally equivalent to the Equal Protection Clause of the Fourteenth Amendment to the Constitution of the United States." White v. Pate, 308 N.C. 759, 765, 304 S.E.2d 199, 203 (1983); see Wang v. UNC-CH Sch. of Med., 716 S.E.2d 646, 656 n.5 (N.C. Ct. App. 2011). Accordingly, to state an equal protection claim under Article I, Section 19 of the North Carolina Constitution, plaintiffs must make the same factual allegations. See, e.g., Bacon v. Lee, 353 N.C. 696, 719–20, 549 S.E.2d 840, 856 (2001) (similarly situated); Wang, 716 S.E.2d at 658–59 (similarly situated); Clayton v. Branson, 170 N.C. App. 438, 457–58, 613 S.E.2d 259, 272–73 (2005) (similarly situated); In re Battle, 166 N.C. App. 240, 245, 601 S.E.2d 253, 255–56 (2004) (intentional or purposeful discrimination and similarly situated).

Plaintiffs allege that because of J.W.'s gender and disability, Moore and Croom conspired to conceal evidence of the student aide's abuse of J.W., and that Moore and Croom would have reported and investigated the allegations of abuse if the student aid had abused a non-disabled student. Am. Compl. ¶¶ 94–95. Defendants respond that plaintiffs have failed to plausibly allege that defendants treated J.W. differently than others similarly situated or that any unequal treatment was because of intentional discrimination. See Defs.' Mem. Supp. Mot. Dismiss 11–14.

To survive the motion to dismiss for failure to state a claim, plaintiffs must allege facts sufficient to establish a plausible basis for believing that defendants impermissibly discriminated

13

against J.W. See, e.g., Coleman, 626 F.3d at 190–91; Francis v. Giacomelli, 588 F.3d 186, 195–96 (4th Cir. 2009); Giarratano, 521 F.3d at 302–04. To plausibly allege an equal protection violation, plaintiffs cannot rely on a conclusory allegation that defendants treated J.W. differently than persons similarly situated. Rather, they must allege facts sufficient to identify actual persons who were similarly situated but treated differently. See, e.g., Harron v. Town of Franklin, 660 F.3d 531, 537 (1st Cir. 2011) ("At a minimum, in order to provide fair notice to the defendants and state facially plausible legal claims, Harron had to identify his putative comparators . . . ." (quotations, citations, and alterations omitted)); Kan. Penn Gaming, LLC v. Collins, 656 F.3d 1210, 1219–20 (10th Cir. 2011) (affirming dismissal of equal protection claims for failure to set out specific examples of similarly situated individuals and differing treatment); Ruston v. Town Bd. for Town of Skaneateles, 610 F.3d 55, 59 (2d Cir. 2010) (affirming dismissal of equal protection claim when plaintiff failed to "allege specific examples" of persons similarly situated but treated differently); Francis, 588 F.3d at 195–96 (affirming dismissal of racial discrimination claim when plaintiffs alleged only that plaintiffs were black, defendants were white, and defendants have never engaged in similar conduct against white employees).

The amended complaint fails to allege facts identifying similarly situated persons who defendants treated differently than J.W. Rather, plaintiffs allege merely that "[u]nder circumstances in which a non-disabled child was subjected to the same or similar abuse, [defendants] *would have* investigated, secured the evidence, and reported the abuse to law enforcement[.]" Am. Compl. ¶ 95 (emphasis added). Such allegations—which do not rise above speculation—fail to establish a plausible basis for believing defendants treated J.W. differently than persons similarly situated. See, e.g., Coleman, 626 F.3d at 191; Francis, 588 F.3d at 195–96 . Thus, plaintiffs failed to state an equal protection claim.

14

In addition, plaintiffs' claim of gender discrimination fails because the amended complaint lacks factual allegations showing that it was plausible that Moore and Croom intentionally discriminated against J.W. because he was a male. The only suggestion in the amended complaint that Moore and Croom discriminated against J.W. due to his gender is plaintiffs' conclusory accusation that they did so. See Am. Compl. ¶ 94. Such a "bare assertion[] devoid of further factual enhancement" is insufficient to state a claim. Nemet Chevrolet, 591 F.3d at 255; see Iqbal, 556 U.S. at 678; Kan. Penn Gaming, 656 F.3d at 1219.

In sum, plaintiffs have failed to allege sufficient facts to state a claim under either the Equal Protection Clause of the Fourteenth Amendment or Article I, Section 19 of the North Carolina Constitution. Thus, the court dismisses claim two.

## D.

Plaintiffs allege various state-law claims. See Am. Compl. ¶¶ 126–67. In claims six, seven, eight, ten, and eleven, plaintiffs allege state-law claims against Moore and Croom, in their individual capacities, and the Board. See id. ¶¶ 126–46, 154–63. In claims nine and twelve, plaintiffs allege state-law claims against only the Board. See id. ¶¶ 147–53, 164–67. Defendants argue that governmental immunity bars plaintiffs' state-law claims against the Board. See Defs.' Mem. Supp. Mot. Dismiss 14–21.

In North Carolina, "[a] county or city board of education is a governmental agency, and therefore may not be liable in a tort action except insofar as it has duly waived its immunity . . . pursuant to statutory authority." Overcash v. Statesville City Bd. of Educ., 83 N.C. App. 21, 22–23, 348 S.E.2d 524, 526 (1986) (collecting cases); see Hallman v. Charlotte-Mecklenburg Bd. of Educ., 124 N.C. App. 435, 437, 477 S.E.2d 179, 180 (1996). North Carolina courts strictly construe statutes authorizing waiver of governmental immunity. See, e.g., Hallman, 124 N.C. App. at 438,

477 S.E.2d at 181. North Carolina General Statute section 115C-42 sets forth how a local board of education may waive its immunity by purchasing liability insurance. N.C. Gen. Stat. § 115C-42. Purchasing liability insurance is the exclusive means for a board to waive immunity. See id. § 115C-42; Lucas v. Swain Cnty. Bd. of Educ., 154 N.C. App. 357, 361, 573 S.E.2d 538, 541 (2002). Furthermore, a board waives its immunity only to the extent of its liability insurance coverage, and the insurance contract must be purchased from a North Carolina-licensed or otherwise qualified insurance company. See N.C. Gen. Stat. § 115C-42.

Plaintiffs allege that the Board has purchased liability insurance in accordance with section 115C-42 and therefore "has waived its governmental immunity from liability for damage by reason of death or injury to person or property caused by the negligence or tort of any agent or employee of the Board when acting within the scope of his authority or within the course of the agent or employee's employment." Am. Compl. ¶ 3. Defendants respond that the Board does not have liability insurance, but rather participates in the North Carolina School Boards Trust ("NCSBT"). See Defs.' Mem. Supp. Mot. Dismiss 16–17. In support, defendants attached to their motion to dismiss the affidavit of Art Stanley, the Board's Chief Financial Officer, stating that the Board has no liability coverage outside of its participation in the NCSBT. See Stanley Aff. [D.E. 18-2] ¶ 4. According to defendants, the Board's participation in the NCSBT is memorialized in a Coverage Agreement, which defendants attached to the motion to dismiss. See [D.E. 18-1] 4–23.[6] According to the Coverage Agreement, the NCSBT is obligated to pay for up to $150,000 in damages resulting from certain claims against the Board. See id. 7.

_____

[6] Plaintiffs do not contest defendants' evidence regarding the Board's agreement with the NCSBT. Therefore, it is unnecessary to hold an evidentiary hearing or to otherwise postpone ruling on the issue of governmental immunity. See Frye, 612 F. Supp. 2d at 701 n.1.

A board's participation in the NCSBT does not waive governmental immunity because the NCSBT does not qualify as liability insurance under section 115C-42. See, e.g., Craig ex rel. Craig v. New Hanover Bd. of Educ., 185 N.C. App. 651, 653–54, 648 S.E.2d 923, 925 (2007), rev'd on other grounds by 363 N.C. 334, 678 S.E.2d 351 (2009); Lail ex rel. Jestes v. Cleveland Cnty. Bd. of Educ., 183 N.C. App. 554, 560–61, 645 S.E.2d 180, 185 (2007); Willett v. Chatham Cnty. Bd. of Educ., 176 N.C. App. 268, 269, 625 S.E.2d 900, 901–02 (2006); Ripellino v. N.C. Sch. Bds. Ass'n, 158 N.C. App. 423, 428–29, 581 S.E.2d 88, 92–93 (2003); Lucas, 154 N.C. App. at 361–62, 573 S.E.2d at 540–41. Accordingly, the Board's participation in the NCSBT does not waive governmental immunity.

Nevertheless, "[a] school board waives its governmental immunity when it procures excess liability insurance coverage through the [NCSBT] from a licensed commercial insurance carrier." Jestes, 183 N.C. App. at 561, 645 S.E.2d at 185; see, e.g., Lucas, 154 N.C. App. at 365, 573 S.E.2d at 543. The Board's Coverage Agreement with the NCSBT provides excess liability insurance coverage ("excess coverage"). See [D.E. 18-1] 7. The NCSBT secured excess coverage for the Board by entering into a Reinsurance Agreement with Selective Insurance Company of the Southeast ("Selective"). See id. 24–45. Pursuant to the Reinsurance Agreement, Selective promises to pay up to $850,000 to the Board for damages above $150,000. See id. 24–25, 40–41.

"When a school board waives its governmental immunity by securing excess insurance, such immunity is waived only to the extent that said board of education is covered by the [excess] insurance policy." Jestes, 183 N.C. App. at 561, 645 S.E.2d at 186; see, e.g., Craig, 185 N.C. App. at 654–55, 648 S.E.2d at 925–26; Ripellino, 158 N.C. App. at 428–29, 581 S.E.2d at 92–93; see also N.C. Gen. Stat. § 115C-42. Defendants argue that because the excess insurance excludes coverage for plaintiffs' state-law claims, the Board has not waived governmental immunity for the state-law

17

claims. See Defs.' Mem. Supp. Mot. Dismiss 17–21. The Reinsurance Agreement states that the agreement "does [not] provide protection for . . . [a]ny 'Claim' to which coverage described in the 'Policy' does not apply." [D.E. 18-1] 25–26. Thus, under the Reinsurance Agreement, Selective does not provide coverage to the Board for legal claims that are not covered by the Board's Coverage Agreement with the NCSBT.[7]

The Coverage Agreement enumerates several claims for which coverage does not apply. See id. 11–14. Exclusion 28 of the Coverage Agreement excluded claims "for intentional infliction of emotional distress or negligent infliction of emotional distress." Id. 14. Moreover, this exclusion explicitly states that the NCSBT *"nor any Excess Insurer* will have an obligation to pay damages" for claims of infliction of emotional distress. Id. (emphasis added). Accordingly, the Board does not have excess coverage for claims of intentional infliction of emotional distress and negligent infliction of emotional distress, and the Board has not waived governmental immunity for claims seven and eleven.

Under Exclusion 12, the Coverage Agreement also excludes from coverage claims "arising out of or in connection with, in whole or in part, . . . dishonest, fraudulent, malicious, wanton, willful, intentional or criminal acts." Id. 12. Although Exclusion 12 then clarifies that coverage is afforded for claims "alleging negligent hiring, negligent training, negligent reporting, negligent investigation, negligent retention and/or negligent supervision arising out of or in connection with the conduct excluded under this exclusion," it also explicitly states that "Excess Insurance (if any) does not provide coverage in any amount for Claims to which this exclusion applies, including but

---

[7] The Reinsurance Agreement defines "Policies" as the "coverage agreements" that the NCSBT issued to its participating "Members." [D.E. 18-1] 34. A "Member" is a "school district . . . that has agreed to participate in the [NCSBT's] errors and omissions/general liability fund." Id. 34. A schedule attached to the Reinsurance Agreement lists the Board as a "Member." Id. 40. A "Claim" is "'[l]itigation' in which damages are sought from the 'Member.'" Id. 33.

18

not limited to claims for negligent hiring, negligent training, negligent reporting, negligent investigation, negligent retention and/or negligent supervision." Id. Accordingly, the Board does not have excess coverage for claims "arising out of or in connection with, in whole or in part, . . . dishonest, fraudulent, malicious, wanton, willful, intentional or criminal acts," "including but not limited to claims for negligent hiring, negligent training, negligent reporting, negligent investigation, negligent retention and/or negligent supervision." Id.

Based on the explicit language of Exclusion 12, the Board does not have excess coverage for negligent supervision—i.e., plaintiffs' twelfth claim, see Am. Compl. ¶¶ 164–67—or for negligent hiring—i.e., the first part of plaintiffs' tenth claim, see id. ¶¶ 155, 158. In addition, based on Exclusion 12, the Board does not have excess coverage for obstruction of public justice—i.e., plaintiffs' sixth claim, see id. ¶¶ 126–30. Obstruction of justice is an intentional act. See Blackburn v. Carbone, 703 S.E.2d 788, 795 & n.6 (N.C. Ct. App. 2010) ("[A]ny action intentionally undertaken by the defendant for the purpose of obstructing, impeding, or hindering the plaintiff's ability to seek and obtain a legal remedy will suffice to support a claim for common law obstruction of justice."). Similarly, the Board does not have excess coverage for wrongful discharge—i.e., plaintiffs' ninth claim. See Am. Compl. ¶¶ 147–53. Wrongful discharge is an intentional act. See, e.g., Garner v. Rentenbach Constructors Inc., 350 N.C. 567, 572, 515 S.E.2d 438, 441 (1999); Kranz v. Hendrick Auto. Grp., Inc., 196 N.C. App. 160, 164, 674 S.E.2d 771, 774 (2009).

Pursuant to Exclusion 23, the Coverage Agreement also excludes from coverage claims

arising out of or in connection with, in whole or in part, sexual acts, sexual molestation, sexual harassment, sexual assault, or sexual misconduct of any kind . . . . This exclusion includes allegations of negligent hiring, negligent supervision, negligent reporting, negligent investigation, negligent training and/or negligent retention of another person who is alleged to have engaged in sexual acts excluded herein. . . . This exclusion also includes allegations of a negligent act or failure to act in response to notice of wrongful conduct excluded herein.

19

[D.E. 18-1] 13. Accordingly, Exclusion 23 precludes coverage for claims related to improper sexual conduct.[8] Thus, the Board does not have excess coverage for parts two and three of plaintiffs' tenth claim—negligence in supervising the student aide and reporting the accusations of sexual abuse, see Am. Compl. ¶¶ 156–58. These allegations relate to the student aide's improper sexual conduct. Likewise, the Board does not have excess coverage for plaintiffs' eighth claim for breach of fiduciary duty. In claim eight, plaintiffs allege that the Board (acting through its employees, Moore and Croom) breached its fiduciary duty to plaintiffs by misleading plaintiffs about reporting J.W.'s accusations of sexual abuse. See id. ¶ 142. Because plaintiffs' eighth claim "aris[es] out of" and is "in connection with" the student aide's improper sexual conduct, the Board does not have excess coverage for claim eight.

In sum, the Board's Coverage Agreement with the NCSBT is not liability coverage. Moreover, despite the Board having secured excess liability coverage, the excess coverage excludes plaintiffs' state-law claims. Accordingly, the Board has not waived governmental immunity for claims six through twelve against the Board. Thus, the court dismisses these claims against the

---

[8] Exclusion 23 states "that this exclusion shall not apply to the extent coverage is provided under the Sexual Acts and Abuse Liability coverage provided under this Coverage Agreement." [D.E. 18-1] 13. The Coverage Agreement provides separate liability coverage of up to $250,000 for claims that fall under "Sexual Acts and Abuse Liability." Id. 7. The Sexual Acts and Abuse Liability coverage encompasses claims for "(1) negligent hiring, negligent supervision, negligent reporting, negligent investigation, negligent training and/or negligent retention of another person who is alleged to have engaged in sexual acts, sexual molestation, sexual harassment, sexual assault, sexual misconduct, improper relationship, or boundary violation *which resulted in Bodily Injury* . . . ; and/or (2) negligent acts or failure to act in response to notice of sexual acts, sexual molestation, sexual harassment, sexual assault, sexual misconduct, improper relationship or boundary violation *which resulted in Bodily Injury* . . . ." Id. 8 (emphasis added). "Bodily Injury" is defined as "physical injury, sickness, disease, including death resulting from any of these[,]" but does not include "emotional distress or any other type of mental injury or suffering" unless such emotional or mental suffering "arises out of that person's physical injury, sickness or disease." Id. 9. Plaintiffs do not allege any "Bodily Injury" in the amended complaint. Thus, the Sexual Acts and Abuse Liability coverage does not apply to plaintiffs' state-law claims.

Board. Furthermore, to the extent plaintiffs allege state-law claims against Moore and Croom in their official capacities, Moore and Croom are immune to the same degree as the Board. See, e.g., Mullis, 347 N.C. at 554–55, 495 S.E.2d at 724–25.

E.

In claim six, plaintiffs allege that Moore and Croom, in their individual capacities, and the Board attempted to obstruct public justice in connection with the student aide's alleged sexual misconduct. See Am. Compl. ¶¶ 126–30. Defendants seek dismissal and argue that plaintiffs failed to state an obstruction of justice claim under North Carolina law. See Defs.' Mem. Supp. Mot. Dismiss 22–23.

"Obstruction of justice is a common law offense in North Carolina." In re Kivett, 309 N.C. 635, 670, 309 S.E.2d 442, 462 (1983). "[A]ny action intentionally undertaken by the defendant for the purpose of obstructing, impeding, or hindering the plaintiff's ability to seek and obtain a legal remedy will suffice to support a claim for common law obstruction of justice." Blackburn, 703 S.E.2d at 795; see In re Kivett, 309 N.C. at 670, 309 S.E.2d at 462.

The amended complaint alleges that Moore and Croom offered assurances to Newsome and J.W.'s mother that Moore and Croom had reported the accusations and that an investigation was underway, but that Moore and Croom never actually filed a report or investigated the accusations. See Am. Compl. ¶¶ 48, 50, 53, 56. In addition, plaintiffs allege that Moore instructed Newsome and J.W.'s mother to not report the accusations, id. ¶ 51, and threatened to fire Newsome if she continued to inquire about an investigation into the accusations. See id. ¶ 65. Defendants respond that plaintiffs' amended complaint fails to state a claim for obstruction of public justice because plaintiffs do not allege that Moore or Croom destroyed evidence, prevented J.W.'s mother from reporting the

accusations against the student aide, or otherwise impeded plaintiffs' attempt to seek legal redress. See Defs.' Mem. Supp. Mot. Dismiss 23.

"The common law offense of obstructing public justice may take a variety of forms." In re Kivett, 309 N.C. at 670, 309 S.E.2d at 462 (quotation omitted); see, e.g., Henry v. Deen, 310 N.C. 75, 88, 310 S.E.2d 326, 334–35 (1984) (deliberately destroying, altering, or falsifying medical documents); In re Kivett, 309 N.C. at 670, 309 S.E.2d at 462 (attempting to prevent convening of grand jury); Burgess v. Busby, 142 N.C. App. 393, 409, 544 S.E.2d 4, 13 (2001) (retaliation against jurors for verdict). Nevertheless, a claim for common law obstruction of public justice must allege conduct that interferes with "an official proceeding [that] is pending or about to be instituted." State v. Eastman, 113 N.C. App. 347, 353, 438 S.E.2d 460, 463 (1994) (quotation omitted); see Broughton v. McClatchy Newspapers, Inc., 161 N.C. App. 20, 33, 588 S.E.2d 20, 30 (2003) ("[P]laintiff presented no evidence that her case . . . was in some way judicially prevented, obstructed, impeded or hindered by the acts of defendants. There is no evidence as to the disposition of that action or any showing that [defendants' conduct] adversely impacted that case."); see also McFadyen v. Duke Univ., 786 F. Supp. 2d 887, 974–77 (M.D.N.C. 2011); State v. Wright, 206 N.C. App. 239, 243–44, 696 S.E.2d 832, 835–36 (2010).

The amended complaint lacks any allegations that defendants' conduct interfered with a pending or potential official proceeding. Moreover, plaintiffs' timely initiation of this action precludes any inference that defendants' conduct interfered with plaintiffs' ability to seek justice in a court. Accordingly, plaintiffs have failed to allege a legally sufficient claim of obstruction of justice. Thus, the court dismisses claim six.

F.

In claim eight, plaintiffs allege that Moore and Croom, in their individual capacities, and the Board breached a fiduciary duty to both Newsome and J.W. See Am. Compl. ¶¶ 138–46. Defendants ask the court to dismiss claim eight because there is no fiduciary relationship between Newsome and defendants or between J.W. and defendants. See Defs.' Mem. Supp. Mot. Dismiss 23–25.

"For a breach of fiduciary duty to exist, there must first be a fiduciary relationship between the parties." Dalton v. Camp, 353 N.C. 647, 651, 548 S.E.2d 704, 707 (2001). A fiduciary relationship "exists in all cases where there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing confidence." Abbitt v. Gregory, 160 S.E. 896, 906 (N.C. 1931); see, e.g., HAJMM Co. v. House of Raeford Farms, Inc., 328 N.C. 578, 588, 403 S.E.2d 483, 489 (1991). In particular, "domination and influence . . . [is] an essential component of any fiduciary relationship." Dalton, 353 N.C. at 652, 548 S.E.2d at 708 (quotation omitted); see Abbitt, 160 S.E. at 906; see also Broussard v. Meineke Discount Muffler Shops, Inc., 155 F.3d 331, 348 (4th Cir. 1998) ("Only when one party figuratively holds all the cards—all the financial power or technical information, for example—have North Carolina courts found that the 'special circumstance' of a fiduciary relationship has arisen."). The existence of a fiduciary relationship often depends on the circumstances of each case. HAJMM, 328 N.C. at 588, 403 S.E.2d at 489. Nevertheless, North Carolina courts have refused to recognize fiduciary relationships in certain circumstances. See, e.g., Dalton, 353 N.C. at 651–52, 548 S.E.2d at 708 (no duty between employer and employee); Strickland v. Lawrence, 176 N.C. App. 656, 662–63, 627 S.E.2d 301, 305–06 (no duty between businesses negotiating at arms length); Ryan v. Univ. of N.C. Hosps., 168 N.C. App. 729, 609

23

S.E.2d 498, 2005 WL 465554, at *4 (Mar. 1, 2005) (unpublished table decision) (no duty "between educator/supervisors and medical residents"); Freese v. Smith, 110 N.C. App. 28, 37, 428 S.E.2d 841, 847 (1993) ("As a general rule, shareholders do not owe a fiduciary duty to each other or to the corporation.").

North Carolina courts generally do not recognize fiduciary relationships between employers and employees. Dalton, 353 N.C. at 651–52, 548 S.E.2d at 708; see, e.g., Speck v. N.C. Dairy Found., Inc., 311 N.C. 679, 685–88, 319 S.E.2d 139, 143–45 (1984); King v. Atl. Coast Line R.R., 72 S.E. 801, 808 (N.C. 1911); Shaver v. N.C. Monroe Constr. Co., 63 N.C. App. 605, 614, 306 S.E.2d 519, 525 (1983); Hiatt v. Burlington Indus., Inc., 55 N.C. App. 523, 529, 286 S.E.2d 566, 569 (1982); see also Breeden v. Richmond Cmty. Coll., 171 F.R.D. 189, 196 n.6 (M.D.N.C. 1997) (Defendant "did not violate a duty of the school to its teachers because the relationship does not impose such a fiduciary duty. Although [an influential Fourth Circuit case was] decided under Virginia law, there is no reason to think North Carolina law would call for a different result." (citation omitted)). Plaintiffs have not alleged any facts that suggest Newsome's employment relationship with defendants warrants an exception to this general rule. Accordingly, Newsome has not stated a claim for breach of fiduciary duty against the Board or Moore and Croom, in their individual capacities.

Defendants also argue that the court should not recognize a fiduciary relationship between J.W. and defendants because no fiduciary relationship exists "in the academic setting." Defs.' Mem. Supp. Mot. Dismiss 24–25. In support, defendants rely on the North Carolina Court of Appeals' unpublished decision in Ryan, which rejected the existence of a fiduciary relationship between a medical student and his "educator/supervisors" at UNC Hospitals. See 2005 WL 465554, at *4. The Ryan court emphasized that in a hospital, educator/supervisors had "divided loyalties" between

24

educating the medical residents and ensuring that patients receive quality care. See id. In addition, the Ryan court noted that "[o]ther jurisdictions have been reluctant to find fiduciary relationships in academic settings." Id. Defendants cite Ryan for the broad proposition that a fiduciary relationship cannot exist in any "academic setting." See Defs.' Mem. Supp. Mot. Dismiss 24.

In Ryan, the North Carolina Court of Appeals "decline[d] to extend the concept of fiduciary relationships to the facts of the present case"—a medical resident working in a teaching hospital. 2005 WL 465554, at *4. Although this court does not read Ryan as broadly as defendants read it,[9] plaintiffs have not cited any North Carolina appellate opinions holding that a fiduciary relationship exists in the middle school setting between a school board, school board superintendent, or principal, and a middle school student. Because this court is analyzing North Carolina law under its supplemental jurisdiction, this court may not expand North Carolina law to create a fiduciary duty between school boards, school superintendents, and principals and middle school students. See Time Warner Entm't-Advance/Newhouse P'ship v. Carteret-Craven Elec. Membership Corp., 506 F.3d 304, 314 (4th Cir. 2007) (federal court sitting in diversity and construing state law should not create or expand state public policy); Broussard, 155 F.3d at 348 ("[A]s a federal court exercising concurrent jurisdiction . . . we are most unwilling to extend North Carolina tort law farther than any North Carolina court has been willing to go."). If North Carolina is to expand public policy in this way, the North Carolina legislature or the Supreme Court of North Carolina must do so. Accordingly, J.W. has failed to state a claim for breach of fiduciary duty against the Board or Moore

_____

[9] The "other jurisdictions" cited in Ryan (South Carolina and Missouri) refused to recognize fiduciary relationships in the undergraduate and graduate academic settings. See id. (citing Hendricks v. Clemson Univ., 353 S.C. 449, 459, 578 S.E.2d 711, 716 (2003) (undergraduate student); Shapiro v. Butterfield, 921 S.W.2d 649, 651 (Mo. Ct. App. 1996) (graduate student)); see also McFadyen, 786 F. Supp. 2d at 986–87 (no fiduciary relationship between university students and administrators).

and Croom, in their individual capacities. In sum, the court dismisses claim eight against all defendants to the extent it alleges a claim for breach of fiduciary duty on behalf of Newsome or J.W.

G.

In claim nine, plaintiffs allege that the Board wrongfully discharged Newsome. See Am. Compl. ¶¶ 147–53. Defendants ask the court to dismiss claim nine because plaintiffs' allegations fail to state a wrongful-discharge claim. See Defs.' Mem. Supp. Mot. Dismiss 25–26.

"The tort of wrongful discharge arises only in the context of employment at will." Claggett v. Wake Forest Univ., 126 N.C. App. 602, 611, 486 S.E.2d 443, 448 (1997); see, e.g., Wagoner v. Elkin City Schs.' Bd. of Educ., 113 N.C. App. 579, 588, 440 S.E.2d 119, 125 (1994). Plaintiffs allege that the Board employed Newsome pursuant to a teaching contract of definite duration and that the Board elected not to renew her teaching contract. See Am. Compl. ¶¶ 71–74. Accordingly, Newsome is not an at-will employee, and plaintiffs have failed to state a claim for the tort of wrongful discharge. See, e.g., Claggett, 126 N.C. App. at 611, 486 S.E.2d at 448.

Alternatively, Newsome was an untenured teacher. See Am. Compl. ¶¶ 23, 35, 37, 67. In North Carolina, a school board "may refuse to renew the contract of any probationary teacher or to reemploy any teacher who is not under contract for any cause it deems sufficient." N.C. Gen. Stat. § 115C-325(m)(2). To the extent the Board refused to renew Newsome's contract for "arbitrary, capricious, discriminatory or for personal or political reasons," id., Newsome had the option to appeal the non-renewal, see id. § 115C-325(n), and Newsome's failure to appeal the Board's decision bars her wrongful-discharge claim. See, e.g., Antonellis v. Cumberland Cnty. Schs.' Bd. of Educ., 206 N.C. App. 329, 698 S.E.2d 556, 2010 WL 3001993, at *4 (Aug. 3, 2010) (unpublished table decision); Gattis v. Scotland Cnty. Bd. of Educ., 173 N.C. App. 638, 640, 622 S.E.2d 630, 631 (2005). Accordingly, the court dismisses claim nine.

26

H.

In claim twelve, plaintiffs allege that the Board negligently supervised Moore, Croom, and the student aide. See Am. Compl. ¶¶ 164–67. Although claim twelve's heading suggests that the claim is also against Moore and Croom in their individual capacities, plaintiffs do not actually allege that Moore and Croom negligently supervised any subordinates. Rather, plaintiffs' allegations pertain only to the Board's knowledge and negligent conduct. See id. Thus, plaintiffs have not stated a negligent-supervision claim against Moore and Croom in their individual capacities. Because the Board has not waived governmental immunity for claims of negligent supervision, the court dismisses claim twelve.

I.

In claim thirteen, plaintiffs allege that the Board deprived J.W. and Newsome of certain rights under the North Carolina Constitution. See Am. Compl. ¶¶ 168–73. Defendants respond that plaintiffs cannot seek relief under the North Carolina Constitution. See Defs.' Mem. Supp. Mot. Dismiss 28–29.

As for J.W.'s constitutional claim, plaintiffs allege that defendants deprived J.W. of his right to "an education free from harm and psychological abuse," in violation of N.C. Const. art. I, §§ 15, 19, and art. IX, § 1. Am. Compl. ¶ 169–70. However, "[n]o North Carolina appellate court has yet recognized a private right of action for damages under the North Carolina Constitution against a local board of education for the denial of the privilege of education." Frye, 612 F. Supp. 2d at 707. In fact, in a case involving analogous facts, the North Carolina Court of Appeals recently refused to recognize a plaintiff's constitutional claim that she was deprived of an education free from harm and psychological abuse. See Doe v. Charlotte-Mecklenburg Bd. of Educ., 731 S.E.2d 245, 252–54 (N.C. Ct. App. 2012). It is not the role of a federal district court to recognize new rights under a state

constitution. See Frye, 612 F. Supp. 2d at 707; see also Time Warner Entm't-Advance/Newhouse P'ship, 506 F.3d at 314–15. Accordingly, the court dismisses J.W.'s constitutional claim in claim thirteen.

As for Newsome's constitutional claim, plaintiffs allege that defendants deprived Newsome of her right to be free from retaliation for advocating for intensive-needs students' federal rights. See Am. Compl. ¶¶ 169–70. In essence, Newsome is asserting her right to free speech, which is expressly guaranteed by N.C. Const. art. I, § 14. Id. ("Freedom of speech and of the press are two of the great bulwarks of liberty and therefore shall never be restrained . . . ."); see Corum v. Univ. of N.C., 330 N.C. 761, 782, 413 S.E.2d 276, 289–90 (1992).

In order to pursue her claim under the North Carolina Constitution, Newsome must demonstrate the absence of adequate state remedies. See Corum, 330 N.C. at 782, 413 S.E.2d at 289. "An adequate state remedy exists if, assuming the plaintiffs claim is successful, the remedy would compensate the plaintiff for the same injury alleged in the direct constitutional claim." Estate of Fennell ex rel. Fennell v. Stephenson, 137 N.C. App. 430, 437, 528 S.E.2d 911, 915–16 (2000) (emphasis omitted), reversed in part on other grounds, 354 N.C. 327, 554 S.E.2d 629 (2001); see Craig, 363 N.C. at 339–40, 678 S.E.2d at 355–56. Here, Newsome had the option of appealing the Board's decision not to renew her teaching contract, and her failure to timely appeal does not render the statutory remedy inadequate. See Copper ex rel. Copper v. Denlinger, 363 N.C. 784, 789, 688 S.E.2d 426, 429 (2010); see also Alt v. Parker, 112 N.C. App. 307, 317–18, 435 S.E.2d 773, 779 (1993) (holding that plaintiffs' state law claim, even though unsuccessful, and the available administrative grievance procedure were adequate state remedies). Moreover, even though governmental immunity bars Newsome's state-law claims against the Board from being adequate remedies, see Craig, 363 N.C. at 339–40, 678 S.E.2d at 355, Newsome's state-law claims against

28

Moore and Croom in their individual capacities are adequate state remedies. See, e.g., Johnson v. Causey, 207 N.C. App. 748, 701 S.E.2d 404, 2010 WL 4288511, at *10 (Nov. 2, 2010) (unpublished table decision); Glenn-Robinson v. Acker, 140 N.C. App. 606, 632, 538 S.E.2d 601, 619 (2000); see also Rousselo v. Starling, 128 N.C. App. 439, 448, 495 S.E.2d 725, 731 (1998) ("Corum did not hold that there had to be a remedy against the State of North Carolina in order to foreclose a direct constitutional claim."). Furthermore, Newsome may still pursue claims for negligent infliction of emotional distress and intentional infliction of emotional distress against Moore and Croom in their individual capacities. If successful, these claims would compensate her for injuries caused by defendants' alleged retaliation. Accordingly, Newsome has adequate state remedies to compensate for her alleged constitutional injury, and cannot assert her constitutional claim. Thus, the court dismisses claim thirteen.

J.

Finally, plaintiffs seek punitive damages. See Am. Compl. ¶ C. The Board cannot be liable for punitive damages. See N.C. Motorcoach Ass'n v. Guilford Cnty. Bd. of Educ., 315 F. Supp. 2d 784, 810 (M.D.N.C. 2004); Ripellino, 158 N.C. App. at 431, 581 S.E.2d at 94. Thus, the court dismisses the claim for punitive damages against the Board.

IV.

In sum, the court DENIES defendants' partial motion to dismiss the complaint [D.E. 14] as moot, and GRANTS in part and DENIES in part defendants' partial motion to dismiss the amended complaint [D.E. 18].

SO ORDERED. This 24 day of September 2012.

JAMES C. DEVER III
Chief United States District Judge