## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
## WESTERN DIVISION
## No. 5:11-CV-707-D

| | |
|---|---|
| J.W., by and through his parent and | ) |
| guardian, and BRENDA NEWSOME, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) **ORDER** |
| | ) |
| THE JOHNSTON COUNTY BOARD | ) |
| OF EDUCATION, ED CROOM, in his | ) |
| individual and official capacities, and | ) |
| JENNIFER MOORE, in her individual | ) |
| and official capacities, | ) |
| | ) |
| Defendants. | ) |

Former special-education teacher Brenda Newsome and her former student, J.W.,

("plaintiffs") have sued the Johnston County Board of Education, Board Superintendent Ed Croom,

and principal Jennifer Moore ("defendants"). See Am. Compl. [D.E. 17]. Plaintiffs' amended

complaint contains a variety of federal and state claims concerning Newsome's employment and

J.W.'s educational environment. See id. On September 24, 2012, the court granted in part and

denied in part defendants' partial motion to dismiss the amended complaint. On September 3, 2013,

defendants moved for summary judgment on the remaining claims [D.E. 39]. On October 22, 2013,

plaintiffs responded in opposition [D.E. 51]. On November 5, 2013, defendants replied [D.E. 53].

Defendants' motion to strike portions of plaintiffs' response in opposition to summary judgment is

also pending [D.E. 54]. As explained below, the court denies defendants' motion to strike and grants

defendants' motion for summary judgment.

Brenda Newsome was a teacher at Selma Middle School ("SMS") in Johnston County, North Carolina, from 2004 to 2009. Newsome taught a "Life Skills" class for special-education students. When the student-population projections for the 2008–2009 school year showed a reduced need for Life Skills classes at SMS, the Board decided to consolidate two of SMS's Life Skills classes into one, which Newsome would teach. See Bisesi Aff. [D.E. 40-10] ¶ 5; Andrews Aff. [D.E. 40-11] ¶¶ 6–7; Moore Dep. [D.E. 40-4, 51-14] 100–01.

Newsome became aware of the Board's decision towards the end of the 2007–2008 school year and disagreed with it. She was concerned that the consolidation would cause her to have more students in her class than she could competently manage, and that she would have to teach Language Arts, a subject she had not previously taught. See Newsome Dep. [D.E. 40-1, 40-2, 51-13] 25, 109–10; Little Dep. [D.E. 40-6] 45. Newsome first expressed those concerns on May 12, 2008, in an email to the other members of the SMS special-education department and to her principal, defendant Jennifer Moore. See id. 109–10, 112, Ex. 15. Newsome also orally expressed her concerns to the other special-education teachers and to members of the SMS administration. See id. 116, 122.

In addition, Newsome sent a letter to her students' parents, dated May 27, 2008, informing them of the pending consolidation of SMS's Life Skills classes and encouraging the parents to "be [their] child's advocate" and to contact the appropriate SMS and Johnston County Schools officials to discuss the consolidation. See id., Ex. 20. Newsome alone drafted and sent the letter, but made it appear to be from the SMS special-education teachers as a group. Newsome claims she attempted to send a draft of the letter to the other special-education teachers asking if they objected to anything

in it, but the other teachers never got the draft and Newsome did not discuss the letter with them before sending it. See id. 144, 146. After the other teachers expressed dismay that Newsome had used their names without permission, Moore met with Newsome and explained to her that she should not have done so. See Moore Dep. 86–88.

During the summer of 2008 and into the beginning of the school year, Newsome investigated whether her consolidated Life Skills class would be larger than allowed under applicable North Carolina Department of Public Instruction ("DPI") guidelines. See Newsome Dep. 124–26, 130–32. The guidelines require a higher staff-to-student ratio for classes containing students with "intensive needs" than for classes containing students who can manage with "sustained support." See [D.E. 51-27]. The Board's special-education administrators determined that Newsome's class was a "sustained support" class. See Bisesi Aff. ¶ 11; Andrews Aff. ¶ 9. Newsome questioned that determination, and even after several discussions with the administration, remained unconvinced that her class was a "sustained support" class rather than an "intensive needs" class. She encouraged her students' parents to independently investigate the matter. See Newsome Dep. 133–34, 202; Bisesi Aff., Ex. B.

Once the 2008–2009 school year began, Newsome struggled to manage her class, as she had predicted she would. In response, Moore offered support to Newsome in several ways. In particular, Moore accommodated Newsome's request for more planning time and for other schedule adjustments, see Newsome Dep. 63–64, 159–61; Moore Dep. 114, and permitted Jenny Wiggins, the mother of plaintiff J.W. and a teaching assistant at SMS, to act as an occasional teaching assistant for Newsome. See Newsome Dep. 41–42, 66–67; Wiggins Dep. [D.E. 40-3, 51-12] 17, 19–20, 22–23; Moore Dep. 114. Newsome also received help with the day-to-day management of her class from Bill Wood, another teaching assistant at SMS, and from the custodial staff. See Newsome Dep.

3

64–67, 158; Wiggins Dep. 70–71. Furthermore, a curriculum specialist, an autism specialist, and a behavioral specialist visited Newsome's classroom and offered suggestions for improvement. See Newsome Dep. 148, 152; Thompson Aff. [D.E. 40-14] ¶ 3. Moore's impression was that Newsome received more support than even a typical beginning teacher. See Moore Dep. 115.

Despite this support, Newsome struggled. Michael Thompson, a behavioral specialist who visited Newsome's classroom two to three times per week, observed that Newsome relied too heavily on her teaching assistant, left her students with too much unstructured time, did not give adequately individualized instruction for students, and failed to implement any suggestions made to her about how to improve her classroom. See Thompson Aff. ¶¶ 5–9. Thompson expressed those concerns to Moore in an email dated January 8, 2009. See id., Ex. A. Likewise, Charlene Butala, the autism specialist who visited Newsome's classroom, told Moore that Newsome was not implementing any of the strategies Butala had suggested. See Moore Aff. [D.E. 40-17] ¶ 7, Ex. E. Similarly, Mary Ann Yansom, another specialist who had visited Newsome and offered suggestions, told Moore that Newsome was not implementing Yansom's suggestions. See id. ¶ 11, ex. H.

Throughout the 2008–2009 school year, Moore expressed concerns to Newsome about her performance. On October 21, 2008, after a meeting, Moore issued a letter officially reprimanding Newsome for sending the letter to parents encouraging advocacy against the consolidation of SMS's Life Skills classes and using other teachers' names without permission, for continuing to suggest to parents that the SMS Life Skills class was larger than allowed by DPI even after administration had explained to her that the class size complied with DPI guidelines, and for often allowing her teaching assistant to be the primary teacher. See Newsome Dep., Ex. 27; Moore Aff. ¶ 4, Ex. A. Moore instructed Newsome, going forward, to direct questions about school-administration decisions to the school administration rather than involving parents, to accept the administration's determination that

4

her class size was appropriate, and not to rely on her teaching assistant as a primary teacher. See Newsome Dep., Ex. 27.

On January 30, 2009, Moore issued a second letter, warning Newsome that she was "at risk of receiving a 'below standard' rating" on the behavior-management and instructional-presentation portions of her year-end evaluation, unless she showed sustained improvement. See Newsome Dep., Ex. 28; Moore Aff. ¶ 9, Ex. F; Moore Dep. 83. In previous years, Newsome's evaluations had been at or above standard in all categories and often included praise from Moore. See [D.E. 51-20] 6–31. During the 2008–2009 school year, Newsome's evaluations were decidedly worse. She was rated as "at standard" in all categories, whereas before she had often been rated as "above standard." See id. 1–5. Moreover, Moore's comments suggested that Newsome's performance had been only minimally at standard and needed significant improvement. See id.

After the 2008–2009 school year, Newsome was eligible to be considered by the Board for "career status," a form of tenure. The Board's policy at the time was that "at standard" performance was not enough to guarantee a grant of career status, nor would it preclude a grant of career status. See Little Dep. 26–28. On May 27, 2009, Moore informed Newsome that she would recommend that the Board not renew Newsome's contract or grant her career status because Newsome had not shown sustained improvement in her teaching and classroom management. See Moore Aff., Ex. I; Moore Dep. 129–30. According to Moore, "[t]he determination for a non-renewal had nothing to do with [Newsome's] advocating," but rather was based on Newsome's failure to show sustained improvement in her "instructional presentation and classroom management." Moore Dep. 134–37; see Moore Aff. ¶ 6.

At that point, Newsome obtained a representative from the North Carolina Association of Educators. On June 1, 2009, Newsome and her representative met for three hours with Robin Little,

5

the Director of Human Resources for Johnston County Schools. See Newsome Dep. 220–22; Little Aff. [D.E. 40-16] ¶ 8, Ex. B. Shortly thereafter, Newsome decided to resign rather than allow the Board to decide not to renew her contract, hoping that by doing so she would be in a better position to find a new teaching job. See Newsome Dep. 225; Little Aff. ¶ 9. On June 4, 2009, Newsome submitted a letter of resignation. See Newsome Dep. 224–25, Ex. 30; Little Aff. ¶ 10. On June 5, 2009, Croom accepted Newsome's resignation. See Little Aff. ¶ 10, Ex. D. After resigning, Newsome regretted doing so. On July 6, 2009, Newsome and her representative met with Croom and asked him to allow Newsome to rescind her resignation. See Newsome Dep. 227–29, Ex. 32. Croom declined. See id., Ex. 32.

## B.

J.W. was a student in Newsome's Life Skills class during the 2008–2009 school year who allegedly was the victim of a sexual assault at SMS on April 2, 2009. That day, J.W. left his art class to go to the bathroom. Another student, S.L., also went to the bathroom, purportedly to help. J.W. See Welch Aff. [D.E. 40-12] ¶ 7. S.L. was a non-special-education student who occasionally acted as a student mentor to students in the Life Skills class. See Wiggins Dep. 92–93; Welch Aff. ¶ 6; Finiello Aff. [D.E. 40-13] ¶ 5. While J.W. was gone to the bathroom, Wiggins, his mother, stopped by the art classroom and noticed that J.W. was missing. Wiggins Dep. 97. When the art teacher, Dorothy Finiello, told Wiggins that J.W. had gone to the bathroom, Wiggins went to look for J.W. Id. 99. After checking one bathroom unsuccessfully, Wiggins tried another, and at the second bathroom she saw J.W. and S.L. exiting the bathroom together, with S.L. pushing J.W. from behind. Id. 104. J.W. appeared pale and stunned to Wiggins, and his shirt was "wadded up like . . . a ball in the back of his pants." Id. 106. Wiggins was troubled, but did not discuss the matter that day with Moore or any other school administrator. Id. 113–14, 122. Wiggins did inform Newsome of what

6

she had seen, but, like Wiggins, Newsome did not report anything to Moore or any other school administrator. See Newsome Dep. 181.

On April 6, 2009, J.W. told Wiggins that S.L. had "touched his privates" while they were in the bathroom together. Wiggins Dep. 126. The next day, Wiggins emailed Moore to report what J.W. had said and what Wiggins had seen on April 2. See Wiggins Dep., 131–32, Ex. 4; Moore Aff. ¶ 16, Ex. J; Moore Dep. 11. At that point, Moore initiated an investigation. She talked to Wiggins, who asked that S.L. no longer be permitted to interact with the Life Skills class. See Wiggins Dep. 139–41; Moore Aff. ¶ 17. She interviewed Finiello and Dorothy Welch, the two faculty members who had been in the art class when J.W. left to go to the bathroom. See Moore Aff. ¶ 18; Moore Dep. 11–12. She interviewed Newsome about whether Newsome thought anything had happened to J.W. See Newsome Dep. 189. She reviewed a surveillance video of the bathroom entrance, which confirmed that J.W. and S.L. had exited the bathroom together on April 2, 2009. See Moore Aff. ¶ 19; Moore Dep. 13.[1] She interviewed S.L., who denied inappropriately touching J.W. See Moore Aff. ¶ 20; Moore Dep. 27–28.

After this initial investigation, Moore reported the incident to Harold Mitchell, a School Resource Officer, but noted that she had been unable to substantiate J.W.'s allegations. Moore Aff. ¶ 21; Moore Dep. 31–32; Mitchell Aff. [D.E. 40-15] ¶¶ 2–4. Even so, Moore transferred S.L. out of J.W.'s art class and instructed S.L. not to interact with the Life Skills students anymore. See Moore Aff. ¶¶ 20, 23. At one point, Wiggins told Newsome that she had seen S.L. in the art class again and Newsome spoke to Moore about it. See Wiggins Dep. 141–42. At another point,

---

[1] No evidence supports plaintiffs' argument concerning spoliation of the videotape evidence. Thus, the court rejects plaintiffs' spoliation argument. See, e.g., Vulcan Materials Co. v. Massiah, 645 F.3d 249, 259–60 (4th Cir. 2011); Silvestri v. Gen. Motors Corp., 271 F.3d 583, 590 (4th Cir. 2001).

Newsome told Moore that she had seen S.L. in the art class, and Moore reiterated her instructions to S.L. See Newsome Dep. 192; Moore Aff. ¶ 25; Moore Dep. 47–48. Newsome's understanding was that Moore "took immediate care of it," and Newsome never saw S.L. in the art class again after that. See id. 192–93.

Wiggins and her husband met with Croom about the incident. Croom then called Moore so that Moore could tell him about her investigation. Croom Dep. [D.E. 51-15] 34. Croom also may have asked Newsome about the incident when Newsome met with Croom to discuss her resignation. See Newsome Dep. 188. A deputy from the Johnston County Sheriff's Department also asked Newsome about the incident. See Newsome Dep. 249–50. J.W.'s parents kept him out of school towards the end of the year to avoid the risk of further encounters with S.L., and they transferred J.W. to an out-of-county school the following year. See Wiggins Decl. [D.E. 51-3] 10–11.

II.

On December 7, 2011, J.W., by and through his parent and guardian, and Newsome initiated this action against Croom and Moore, both in their individual and official capacities, and the Board. See Compl. [D.E. 1]. The court granted defendants' motion to dismiss several of plaintiffs' claims, see [D.E. 27], and the following claims remain:

(1) J.W. claims that the Board created a hostile education environment for him, and discriminated against him because of his sex and disability, in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101–12213; Section 504 of the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. § 794, Title IX of the Education Amendment of 1972 ("Title IX"), 20 U.S.C. §§ 1681–1688, and the Fourteenth Amendment of the United States Constitution. See Am. Compl. ¶¶ 78–91; [D.E. 27] 9–12.

(2) Newsome claims that the Board retaliated against her for attempting to enforce the rights of her special-education students, in violation of Title IX, the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400–1482, and the Fourteenth Amendment. See Am. Compl. ¶¶ 99–108; [D.E. 27] 9–12.

8

(3) Newsome claims that Moore and Croom, acting in their individual capacities, and the Board, retaliated against Newsome for voicing her concerns about the alleged assault of J.W. and the consolidation of Life Skills classes at SMS, in violation of the First Amendment. See Am. Compl. ¶¶ 109–17.

(4) Plaintiffs claim that Moore and Croom, acting in their individual capacities, and the Board, are liable as supervisors under 42 U.S.C. § 1983 for being "deliberately indifferent to the constitutional rights of . . . disabled children at [the School]" by failing to prevent S.L. from sexually assaulting intensive-needs students. See id. ¶¶ 118–25.

(5) Both J.W. and Newsome claim that Moore and Croom, acting in their individual capacities, and the Board, based on the conduct of its employees while acting within the scope of their employment, intentionally inflicted severe emotional distress on J.W. and Newsome. See id. ¶¶ 131–37, 160–63.

Defendants have moved for summary judgment on the remaining claims [D.E. 39]. Summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986). In evaluating a motion for summary judgment, the court views the evidence and the inferences drawn from that evidence in the light most favorable to the nonmoving party. See Tolan v. Cotton, 134 S. Ct. 1861, 1863 (2014) (per curiam); Scott v. Harris, 550 U.S. 372, 378 (2007).

The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. See Celotex, 477 U.S. at 325. Once the moving party has met its burden, the nonmoving party "must come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (emphasis and quotation omitted). The nonmoving party must do more than present a "scintilla of evidence" in its favor. Anderson, 477 U.S. at 252. Rather, the nonmoving party must present "sufficient evidence" such that reasonable jurors could find for it. Id. at 249. Accordingly, a court may grant summary judgment if the nonmoving party's evidence is "merely colorable" or

9

"not significantly probative." Id. at 249–50; see Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 962 (4th Cir. 1996). The court denies defendants' motion to strike [D.E. 54], but considers declarations and affidavits only to the extent they are consistent with the affiant's or declarant's prior deposition testimony. See, e.g., Rohrbough v. Wyeth Labs., Inc., 916 F.2d 970, 975–76 (4th Cir. 1990).

## A.

The court first addresses J.W.'s hostile educational environment claim against the Board. Under Title IX, "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).[2] Title IX's prohibition on sex-based discrimination encompasses student-on-student sexual harassment. See Davis v. Monroe Cnty. Bd. of Educ., 526 U.S. 629, 646–47 (1999). "A school district may be held liable under Title IX only for its own misconduct," not for the misconduct of its agents or those under its control. Baynard v. Malone, 268 F.3d 228, 237 (4th Cir. 2001); see Davis, 526 U.S. at 640. Thus, to prove a Title IX claim on the basis of student-on-student sexual harassment, a plaintiff must show that (1) he was a student at an educational institution receiving federal funds; (2) he was subjected to harassment based on his sex; (3) the harassment was so severe, pervasive, and objectively offensive that it created a hostile or abusive educational environment; and (4) the educational institution had actual knowledge of the harassment but was deliberately indifferent. See Davis, 526 U.S. at 650; Rouse v. Duke Univ., 535 F. App'x 289, 293 n.* (4th Cir. 2013) (per curiam) (unpublished); Jennings v. Univ. of N.C., 482 F.3d 686, 695 (4th Cir. 2007) (en banc).

---

[2] The Board receives federal funding and is subject to Title IX.

10

Assuming without deciding that J.W. was subjected to harassment based on his sex and that the alleged one-time incident of sexual harassment by S.L. was sufficiently severe, pervasive, and objectively offensive to create a hostile or abusive educational environment, J.W. has not shown that there is a genuine issue of material fact concerning whether the Board was deliberately indifferent to the alleged harassment. An educational institution is only deliberately indifferent to acts of student-on-student sexual harassment if its response (or lack thereof) to the sexual harassment is "clearly unreasonable in light of the known circumstances," and in general, "[c]ourts should refrain from second-guessing the disciplinary decisions made by school administrators." Davis, 526 U.S. at 648. The record shows that Moore thoroughly investigated the alleged assault as soon as she became aware of it, attempted to prevent any further contact between J.W. and S.L., and kept Croom informed. Defendants' response does not reflect deliberate indifference. See, e.g., Kinman v. Omaha Pub. Sch. Dist., 171 F.3d 607, 609–10 (8th Cir. 1999). Accordingly, the court grants summary judgment to defendants on J.W.'s Title IX hostile educational environment claim.

As for J.W.'s hostile educational environment based on disability claims under the ADA, Section 504 of the Rehabilitation Act, and the Fourteenth Amendment, the ADA states that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, privileges, advantages, or accommodations of any place of public accommodation." 42 U.S.C. § 12182(a). Section 504 of the Rehabilitation Act states that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). Assuming without deciding that a cause of action for a hostile educational environment based on disability exists under those statutes or the Fourteenth Amendment, to prove such a claim J.W. would have

11

to show severe and pervasive harassment based on his disability, and deliberate indifference to that harassment on the Board's part. See, e.g., Guckenberger v. Boston Univ., 957 F. Supp. 306, 314 (D. Mass. 1997). J.W., however, has not offered evidence to permit a rational jury to find any harassment or discrimination based on his disability, much less severe and pervasive harassment or discrimination based on his disability. Likewise, no rational jury could find that the Board was deliberately indifferent. Accordingly, the court grants summary judgment to defendants on J.W.'s hostile educational environment based on disability claims under the ADA, Section 504 of the Rehabilitation Act, and the Fourteenth Amendment.

B.

Next, the court addresses Newsome's claim that the Board retaliated against her for attempting to enforce the rights of her special-education students, in violation of Title IX, the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400–1482, and the Fourteenth Amendment. "[W]hen a funding recipient retaliates against a person because [s]he complains of sex discrimination, this constitutes intentional 'discrimination' 'on the basis of sex,' in violation of Title IX." Jackson v. Birmingham Bd. of Educ., 544 U.S. 167, 174 (2005). Newsome claims the Board retaliated against her for informing Moore that she had seen S.L. in J.W.'s art class after Moore had told S.L. that he was not to be in the class. See Mem. Opp. Summ. J. [D.E. 51] 13–14. Newsome admitted in her deposition, however, that Moore immediately addressed that issue and that Newsome never again saw S.L. in the art class. Newsome Dep. 192–93. Moreover, Newsome has not offered a shred of evidence suggesting that any event related to J.W.'s alleged assault had anything to do with Moore's decision to not recommend that Newsome's contract be renewed after the 2008–2009 school year. Accordingly, the court grants summary judgment to defendants on Newsome's Title IX retaliation claim. For the same reasons, the court grants summary judgment to defendants on

12

Newsome's Fourteenth Amendment retaliation claim.

As for Newsome's IDEA retaliation claim, Congress enacted the IDEA "to ensure that all children with disabilities have available to them a free appropriate public education" and "to ensure that the rights of children with disabilities and parents of such children are protected." 20 U.S.C. § 1400(d)(1). The IDEA requires school districts to create "individualized educational programs," or "IEPs," for each of their disabled students. 20 U.S.C. § 1414(d)(2)(A); see Schaffer v. Weast, 546 U.S. 49, 51–53 (2005). IEPs are developed in a "cooperative process" between parents and schools. Schaffer, 546 U.S. at 53. If parents and schools disagree about the content of a child's IEP, the IDEA provides for an administrative process to resolve the disagreement. 20 U.S.C. § 1415(f). Then, if either party is "aggrieved by the findings and decision made" through the administrative process, that party may bring a civil action. Id. § 1415(i)(2); see Winkleman v. Parma City Sch. Dist., 550 U.S. 516, 525–27 (2007). Thus, the IDEA "establishes a private right of action for disabled children and their parents" who have exhausted the administrative process and yet been unable to obtain a satisfactory IEP. Lake Washington Sch. Dist. No. 414 v. Office of Superintendent of Pub. Instruction, 634 F.3d 1065, 1068 (9th Cir. 2011); Lawrence Township Bd. of Educ. v. New Jersey, 417 F.3d 368, 371 (3d Cir. 2005). The IDEA does not, however, establish a private right of action for special-education teachers or other advocates for disabled students. See, e.g., Wooderts v. Dallas I.S.D., No. 3-10-CV-0573-P, 2010 WL 2160144, at *2 (N.D. Tex. May 3, 2010), adopted, 2010 WL 2160142 (N.D. Tex. May 26, 2010) (unpublished); Ryan v. Shawnee Mission U.S.D. 512, 416 F. Supp. 2d 1090, 1098 (D. Kan. 2006). Accordingly, the court grants summary judgment to defendants on Newsome's IDEA retaliation claim.[3]

---

[3] In support of her IDEA claim, Newsome cites Settlegood v. Portland Public Schools, 371 F.3d 503, 509–10 (9th Cir. 2004), and Weber v. Cranston School Committee, 212 F.3d 41, 51 (1st

13

C.

Next, the court addresses Newsome's First Amendment retaliation claim. To prevail on the claim, Newsome must show that (1) she spoke as a citizen on a matter of public concern, rather than as an employee on a matter of private interest, (2) her interest in speaking on the matter of public concern outweighed the defendants' interest in providing effective and efficient public service, (3) defendants took some action against her that deprived her of a valuable government benefit or that would tend to chill her protected speech; and (4) a causal relationship existed between her protected speech and the retaliation. See, e.g., Smith v. Gilchrist, 749 F.3d 302, 308 (4th Cir. 2014); Bland v. Roberts, 730 F.3d 368, 373–75 (4th Cir. 2013); Peters v. Jenney, 327 F.3d 307, 322 (4th Cir. 2003); Goldstein v. Chestnut Ridge Volunteer Fire Co., 218 F.3d 337, 351–52, 356 (4th Cir. 2000); McVey v. Stacy, 157 F.3d 271, 277–78 (4th Cir. 1998).

Newsome contends that defendants impermissibly retaliated against her for speaking about two topics: the alleged sexual assault of J.W. and the consolidation of Life Skills classes at SMS. See Mem. Opp. Summ. J. 21–23. In neither case has she created a genuine issue of material fact as to whether she spoke as a citizen on a matter of public concern. Whether a public employee has spoken as a citizen on a matter of public concern is a question of law for the court. See, e.g., Connick v. Myers, 461 U.S. 138, 148 n.7 (1983); Urofsky v. Gilmore, 216 F.3d 401, 406 (4th Cir. 2000) (en banc); Huang v. Bd. of Governors of Univ. of N.C., 902 F.2d 1134, 1140 (4th Cir. 1990). "[W]hen public employees make statements pursuant to their official duties," and not in their

---

Cir. 2000). Neither case supports the proposition that the IDEA gives Newsome a private right of action. Settlegood involved a teacher's claims under the First Amendment and Section 504 of the Rehabilitation Act, not the IDEA. See Settlegood, 371 F.3d at 509. Weber involved a parent's claim under Section 504 of the Rehabilitation Act, not directly under the IDEA, and involved the parent of a disabled child, not a teacher or other advocate. See Weber, 212 F.3d at 44–47.

14

capacities as private citizens, "the Constitution does not insulate their communications from employer discipline." Garcetti v. Ceballos, 547 U.S. 410, 421 (2006); see Andrew v. Clark, 561 F.3d 261, 267–68 (4th Cir. 2009); Urofsky, 216 F.3d at 406–09.[4] Even when public employees do not speak pursuant to their official job duties, the First Amendment insulates them from adverse employment action only if the "content, form, and context" of the speech, "as revealed by the whole record," show that the speech involved a matter of public concern. Connick, 461 U.S. at 147–48; see, e.g., City of San Diego v. Roe, 543 U.S. 77, 83 (2004) (per curiam); Durham v. Jones, 737 F.3d 291, 299 (4th Cir. 2013). "This is a subtle, qualitative inquiry," requiring "the exercise of common sense." Goldstein, 218 F.3d at 353; see Connick, 461 U.S. at 143 (acknowledging the "common-sense realization that government offices could not function if every employment decision became a constitutional matter").

As for content, "[s]peech involves a matter of public concern when it involves an issue of social, political, or other interest to a community." Urofsky, 216 F.3d at 406, see, e.g., City of San Diego, 543 U.S. at 83–84; Campbell v. Galloway, 483 F.3d 258, 267 (4th Cir. 2007). In contrast, "it is settled that a public employee's expression of grievances concerning [her] own employment is not a matter of public concern." Huang, 902 F.2d at 1140; see Borough of Duryea v. Guarnieri, 131 S. Ct. 2488, 2501 (2011); Campbell, 483 F.3d at 267; Stroman v. Colleton Cnty. Sch. Dist., 981 F.2d 152, 156 (4th Cir. 1992). After all, "government offices could not function if every

_____

[4] In Garcetti, the Court recognized "some argument" that this rule may not apply when an employee's job duties involve "expression related to academic scholarship or classroom instruction." Garcetti, 547 U.S. at 425. Nonetheless, when a teacher is performing administrative duties, as opposed to instructional duties, the Garcetti rule fully applies. See Adams v. Trustees of Univ. of N.C.–Wilmington, 640 F.3d 550, 563–64 (4th Cir. 2011).

15

Case 5:11-cv-00707-D   Document 63   Filed 09/24/14   Page 15 of 23

employment decision became a constitutional matter." Connick, 461 U.S. at 143; see Brooks v. Arthur, 685 F.3d 367, 373 (4th Cir. 2012); Holland v. Rimmer, 25 F.3d 1251, 1255 (4th Cir. 1994).

The distinction between private employee grievances and issues of public concern can be murky, however, because "[e]very public employee's job by definition affects the public." Robinson v. Balog, 160 F.3d 183, 189–90 (4th Cir. 1998). Thus, courts look to the context and form of an employee's statements to ensure the employee does not "cunningly transform a simple employment grievance into a public spectacle." Id. at 189; see Connick, 461 U.S. at 148. In general, speech is less likely to be of public concern if the context suggests that the employee was motivated more by self interest than by the public interest. See, e.g., Hanton v. Gilbert, 36 F.3d 4, 7 (4th Cir. 1994); Joyner v. Lancaster, 815 F.3d 20, 23 (4th Cir. 1987); Lewis v. Blackburn, 734 F.2d 1000, 1010 (4th Cir. 1984) (Ervin, J., dissenting), dissent adopted, 759 F.2d 1171 (4th Cir. 1985) (en banc); cf. Campbell, 483 F.3d at 270; Piver v. Pender Cnty. Bd. of Educ., 835 F.2d 1076, 1080 (4th Cir. 1987). For example, if the speech at issue was made in unison by several employees, it is more likely to be on a matter of public concern, and not "the expression of a single disgruntled employee." Cromer v. Brown, 88 F.3d 1315, 1326 (4th Cir. 1996); see Brooks, 685 F.3d at 374.

In the public-schools context, the Fourth Circuit has cautioned that simply because an issue "affects [the] ability to teach" does not make the issue one of public concern. After all, "[t]he identical point can be made about innumerable conditions at a school, including, for example, the number of teacher aides, the tightness of class scheduling, the size of blackboards, or the adequacy of laboratory equipment." Daniels v. Quinn, 801 F.2d 687, 690 (4th Cir. 1986). "Questions of this sort do not belong in federal court. They are best resolved by local school boards and individual school administrators. To accord to all such grievances the status of protected speech is to invite a

16

measure of educational involvement that federal tribunals are ill equipped to undertake." Id.; see also Boring v. Buncombe Cnty. Bd. of Educ., 136 F.3d 364, 369–71 (4th Cir. 1998) (en banc).

In applying these principles, the Fourth Circuit has held that teachers did not address issues of public concern by complaining to a school board member about not receiving particular instructional materials, Daniels, 801 F.2d at 690, or disputing whether a controversial play or controversial bulletin-board items were consistent with the school's curriculum. Lee v. York Cnty. Sch. Div., 484 F.3d 687, 694 (4th Cir. 2007); Boring, 136 F.3d at 368–70; see also Fox v. Traverse City Area Pub. Schs. Bd. of Educ., 605 F.3d 345, 348–49 (6th Cir. 2010) (holding that a teacher's complaints to administrators about class size did not address an issue of public concern) Cliff v. Bd. of Sch. Comm'rs, 42 F.3d 403, 410–11 (7th Cir. 1994) (same). In contrast, the Fourth Circuit has held that teachers did address issues of public concern by publicly advocating for the renewal of a principal's contract, Piver, 835 F.2d at 1078–80, by writing a satirical letter to the school's newspaper concerning allegations of systemic gender discrimination at the school, Seemuller v. Fairfax Cnty. Pub. Schs., 878 F.2d 1578, 1582–83 (4th Cir. 1989), and by criticizing the school board's budgeting decisions in letters to the local newspaper and in other ways. Hall v. Marion School Dist. No. 2, 31 F.3d 183, 192–93 (4th Cir. 1994); see Pickering v. Bd. of Educ., 391 U.S. 563, 571–72 (1968).

As for Newsome's claimed speech about the alleged sexual assault of J.W., the record shows that her speech consisted of being interviewed by Moore about the incident and notifying Moore that she had seen S.L., the alleged perpetrator, in J.W.'s art class after Moore had prohibited S.L. from being there.[5] Newsome engaged in this speech pursuant to her job duties as a teacher at SMS, and

---

[5] Newsome suggests that Croom may have asked her about J.W.'s assault when she met with him to discuss her resignation, but she does not remember whether Croom actually asked her about

17

therefore was speaking as an employee, and not as a private citizen. See Garcetti, 547 U.S. at 421; Urofksy, 216 F.3d at 406–09. Moreover, the record contains no indication that Newsome was dissatisfied with Moore's or Croom's response to the alleged assault of J.W., much less that Newsome engaged in the sort of public advocacy that the First Amendment would protect. Indeed, when Newsome notified Moore that she had seen S.L. in J.W.'s art class, Newsome felt that Moore "took immediate care" of the issue and Newsome never saw S.L. in the art class again. See Newsome Dep. 192–93.

As for Newsome's speech about the consolidation of Life Skills classes at SMS, the record shows that the speech involved a personal grievance about working conditions rather than advocacy on an issue of public concern. To be sure, the size of special-education classes could be an issue of public concern, but here, the content, form, and context of the speech as revealed by the whole record show Newsome was motivated by her own concerns about her capacity to manage her expanded job responsibilities. See Fox, 605 F.3d at 348–49; Cliff, 42 F.3d at 410–11. Newsome attempted to engineer the spectre of widespread concern by including other teachers' names (without their knowledge or consent) in her letter to parents. In truth, however, Newsome was expressing the dissatisfactions of a single employee. See, e.g., Cromer, 88 F.3d at 1326. Accordingly, Newsome has not created a genuine issue of material fact concerning whether she spoke as a citizen on a matter of public concern.

Newsome also has failed to create a genuine issue of material fact as to whether her interest in speaking about the consolidation of Life Skills classes at SMS outweighed defendants' interest in providing effective and efficient public service. "Just as an employee has a right to speak—even

---

J.W.'s assault, and if he did, she does not suggest what she might have said in return. See Newsome Dep. 188.

at work—public employers have the right to run efficient, functional operations, and [courts] must ensure the proper balance between these competing interests." Goldstein, 218 F.3d at 351; see Lane v. Franks, 134 S. Ct. 2369, 2377 (2014); Garcetti, 547 U.S. at 418; Rankin v. McPherson, 483 U.S. 378, 384 (1987); Connick, 461 U.S. at 151–54; Pickering, 391 U.S. at 568.

In conducting this balancing, courts are to examine the extent to which the speech at issue impaired the maintenance of discipline by supervisors, impaired harmony among coworkers, prevented the employee from fulfilling her job responsibilities, or otherwise impaired the functioning of the employer agency, among other factors not relevant here. See Smith, 749 F.3d at 309; Bland, 730 F.3d at 374; Ridpath v. Bd. of Governors Marshall Univ., 446 F.3d 292, 317 (4th Cir. 2006); McVey, 157 F.3d at 278. Although Newsome struggled to fulfill her job responsibilities, and in doing so impaired the ability of SMS to fulfill its mission, nothing suggests that Newsome's speech caused those shortcomings. The record does, however, show that Newsome challenged the authority of the SMS administration by continuing to question whether they had properly interpreted the DPI guidelines as to what her class size should be. "When employee speech concerning office policy arises from an employment dispute concerning the very application of that policy to the speaker," as happened in this case, "additional weight must be given to the supervisor's view that the employee has threatened the authority of the employer to run the office." Connick, 461 U.S. at 153. Furthermore, Newsome's unauthorized use of her coworkers' names on a letter to parents could reasonably be anticipated to impair harmony among coworkers. See Smith, 749 F.3d at 309 (explaining that the employer need not "prove that the employee's speech actually disrupted efficiency, but only that an adverse effect was reasonably to be apprehended" (quotation omitted)); see Connick, 461 U.S. at 152. "[S]chool districts must have wide latitude to run schools." Hall, 31 F.3d at 195; Stroman, 981 F.2d at 156–60. Defendants' actions in this case were well within that

19

wide latitude. Accordingly, Newsome has failed to create a genuine issue of material fact concerning whether her interest in speaking about the consolidation of Life Skills classes at SMS outweighed defendants' interest in providing effective and efficient public service.

Finally, Newsome also has failed to create a genuine issue of material fact concerning causation. In First Amendment retaliation cases, "[t]he causation requirement is rigorous." Huang, 902 F.2d at 1140. The employee initially must show that the protected expression was a substantial or motivating factor in the employer's decision to take adverse action. Bland, 730 F.3d at 375; Peters, 327 F.3d at 323; Stroman, 981 F.2d at 156; Maciariello v. Sumner, 973 F.2d 295, 299 (4th Cir. 1992). If the employee meets that burden of proof, the burden then shifts to the employer to show that it would have taken the adverse action even if the employee had not engaged in the protected speech. Bland, 730 F.3d at 375; Peters, 327 F.3d at 323.

Here, Moore expressly stated that her May 2009 decision not to recommend renewal of Newsome's contract had "nothing to do with" Newsome's advocacy and was based solely on her performance in 2008–2009 as a classroom teacher. Moore Dep. 134–37; see Moore Aff. ¶ 6.[6] Newsome attempts to refute Moore's testimony and cites three pieces of evidence. First, Newsome cites her end-of-year teacher evaluations. See Pls.' Mem. Opp. Summ. J. 19–20. Newsome's year-end evaluations and the record, however, support Moore's contention that Newsome's performance deteriorated during the 2008–2009 school year. In prior years, Newsome had been rated at or above standard in all categories, but in 2008–2009, she had no above-standard ratings, and many of her at-

---

[6] In addition to Moore's non-renewal recommendation, Newsome claims that Moore's formal letter of reprimand on October 21, 2008, and Croom's July 2009 refusal to allow Newsome to withdraw her resignation were retaliatory adverse actions. See Pls.' Mem. Opp. Summ. J. 18. Rather than engaging in an independent analysis for each action, the court analyzes them as part of the "whole record" of actions that culminated in Newsome's not being rehired after the 2008–2009 school year. See, e.g., Connick, 461 U.S. at 143, 147–48.

20

standard ratings were noted as being "minimally at standard," needing significant improvement. See [D.E. 51-20]. Moreover, in 2009, the Board's policy was that "at standard" performance was not enough to guarantee a grant of career status, much less "minimally at standard" performance. Additionally, the record teems with evidence that Newsome did struggle as a teacher in the 2008–2009 school year, despite Moore's efforts to help her. Cf. Goldstein, 218 F.3d at 358 (finding that efforts to ameliorate an employee's complaints support an employer's contention that it did not retaliate against the employee for making those complaints).

Second, Newsome cites statements by Wiggins and another parent, Pamela Deans, that Newsome was a good teacher. See Mem. Opp. Summ. J. 20 (citing Wiggins Decl. [D.E. 51-3] ¶ 4 and Deans Decl. [D.E. 51-6] ¶ 10). These statements, however, shed no light on the relevant question, which is how Moore, Croom, and the Board perceived Newsome to be performing as a teacher in the 2008–2009 school year. See, e.g., King v. Rumsfeld, 328 F.3d 145, 149 (4th Cir. 2003); Hawkins v. PepsiCo, Inc., 203 F.3d 274, 280 (4th Cir. 2000).

Third, Newsome contends that her advocacy preceded the deterioration in her teacher evaluations during 2008–2009 and thereby raises a genuine issue of material fact concerning causation. Newsome, however, offers no evidence that her teaching did not deteriorate during the 2008–2009 year, and defendants offer ample evidence about the deterioration (including efforts to help her improve). Furthermore, Newsome offers no evidence that her contract would have been renewed in June 2009 had she never spoken about the consolidation of Life Skills classes at SMS in May 2008 or the assault of J.W. in April 2009. Finally, this court rejects Newsome's reliance on the fallacy of false cause (i.e., post hoc ergo propter hoc). Simply put, on this record, the fact that Newsome's advocacy preceded her poor performance as a teacher during the 2008–2009 school year, Moore's May 2009 non-renewal recommendation, and Newsome's decision to resign in June 2009,

21

does not permit an inference of causation between her speech and any adverse employment action. See, e.g., Clark Cnty Sch. Dist. v. Breeden, 532 U.S. 268, 273 (2001) (per curiam); King, 328 F.3d at 151. Likewise, no evidence suggests that, in July 2009, Croom considered Newsome's advocacy in deciding not to allow Newsome to withdraw her resignation. Accordingly, the court grants summary judgment to defendants on Newsome's First Amendment retaliation claim.

D.

Next, the court addresses plaintiffs' "supervisory liability" claim pursuant to 42 U.S.C. § 1983. Section 1983 provides a right of action against "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983.

"If there is no violation of a federal right, there is no basis for a section 1983 action." Hodge v. Jones, 31 F.3d 157, 167 (4th Cir. 1994) (quotation omitted). Neither J.W. nor Newsome was deprived of any federal right. Accordingly, the court grants summary judgment to defendants on plaintiffs' section 1983 claim.

E.

Finally, the court addresses plaintiffs' claim of intentional infliction of emotional distress. "The essential elements of an action for intentional infliction of emotional distress are (1) extreme and outrageous conduct by the defendant (2) which is intended to and does in fact cause (3) severe emotional distress." Waddle v. Sparks, 331 N.C. 73, 82, 414 S.E.2d 22, 27 (1992) (quotation omitted); see, e.g., Moody-Williams v. LipoScience, 953 F. Supp. 2d 677, 682 (E.D.N.C. 2013). "Conduct is extreme and outrageous when it is so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly

22

intolerable in a civilized community." Smith-Price v. Charter Behavioral Health Sys., 164 N.C. App. 349, 354, 595 S.E.2d 778, 782 (2004); see Wagoner v. Elkin City Sch.'s Bd. of Educ., 113 N.C. App. 579, 586, 440 S.E.2d 119, 123 (1994). Whether conduct is "extreme and outrageous" is a question of law. Lenins v. K-Mart Corp., 98 N.C. App. 590, 599, 381 S.E.2d 843, 848 (1990).

North Carolina courts have been extremely reluctant to find actionable intentional infliction of emotion distress claims in the employment context. See, e.g., Bratcher v. Pharm. Prod. Dev., Inc., 545 F. Supp. 2d 533, 544–45 (E.D.N.C. 2008) (collecting cases). Newsome's claim arises in the employment context and fails. See id. J.W.'s claim does not arise in the employment context. Nonetheless, as a matter of law, plaintiffs have offered no evidence that defendants engaged in conduct that is "extreme and outrageous" under North Carolina law. Likewise, no rational jury could find that defendants ratified extreme and outrageous conduct. Cf., e.g., Bryant v. Thalhimer Bros., Inc., 113 N.C. App. 1, 16, 437 S.E.2d 519, 529 (1993). Accordingly, the court grants summary judgment to defendants on plaintiffs' intentional infliction of emotional distress claim.

III.

In sum, the court DENIES defendants' motion to strike [D.E. 54], GRANTS defendants' motion to seal [D.E. 41], and GRANTS defendants' motion for summary judgment [D.E. 39]. The clerk shall close the case.

SO ORDERED. This **24** day of September 2014.

JAMES C. DEVER III
Chief United States District Judge

23